Paul J. Roshka Jr. (#009285)
proshka@polsinelli.com
T.J. Mitchell (#034827)
tmitchell@polsinelli.com
Polsinelli PC
CityScape, One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Telephone:  (602) 650-2000
Facsimile:  (602) 264-7033 Fax
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Global Remote Sensing Solutions LLC, a Colorado limited liability company,<br><br>                              Plaintiff,<br>vs.<br><br>Edward Stephenson, Jr. and Jane Doe Stephenson, husband and wife; ES Holdings One LLC, a Delaware limited liability company; Robert "Bob" Brailey and Carole M. Brailey, husband and wife; Guery Williamceau and Jane Doe Williamceau, husband and wife; and NFG International Holding Group Incorporation Limited, a foreign Hong Kong private company limited by shares,<br><br>                              Defendants. | **Complaint**<br><br>**(Securities Fraud, Common Law Fraud, Negligent Misrepresentation, Conversion, Breach of Fiduciary Duty, Fraudulent Concealment and Punitive Damages)** |

Plaintiff Global Remote Sensing Solutions LLC (hereafter "GRSS") alleges as follows:

## THE PARTIES

1.     GRSS is a Colorado limited liability company headquartered in Arizona.

2.     Edward "Ed" Stephenson, Jr. (hereafter, "Stephenson") is an individual who resides in Connecticut who caused, participated in or induced events occurring within Maricopa County, Arizona out of which these claims arise.

1

3.     Upon information and belief, Stephenson is a married man. Jane Doe Stephenson is a party to this lawsuit for the sole reason of binding Stephenson's marital community, if any exists. The real name of Stephenson's spouse, if one exists, will be substituted for the placeholder of Jane Doe Stephenson when her legal name is discovered.

4.     ES Holdings One LLC (hereafter, "ES Holdings") is a Delaware limited liability company that conducted business in Maricopa County, Arizona and at times relevant hereto caused, participated in or induced events occurring within Maricopa County, Arizona out of which these claims arise. Upon information and belief, this entity is controlled by Stephenson.

5.     Robert "Bob" Brailey (hereafter "Brailey") is an individual who resides in New York who caused, participated in or induced events occurring within Maricopa County, Arizona out of which these claims arise.

6.     Upon information and belief, Brailey is married to Carole M. Brailey. Carole M. Brailey is a party to this lawsuit for the sole reason of binding Brailey's marital community, if any exists.

7.     Guery Williamceau (hereafter "Williamceau") is an individual whose residence is unknown, who caused, participated in or induced events occurring within Maricopa County, Arizona out of which these claims arise.

8.     Upon information and belief, Williamceau is a married man. Jane Doe Williamceau is a party to this lawsuit for the sole reason of binding Williamceau's marital community, if any exists. The real name of Williamceau's spouse, if one exists, will be substituted for the placeholder of Jane Doe Williamceau when her legal name is discovered.

9.     NFG International Holding Group Incorporation Limited (hereafter, "NFG") is a Hong Kong private company limited by shares that conducted business in Maricopa County, Arizona and at times relevant hereto caused, participated in or induced events occurring within Maricopa County, Arizona out of which these claims arise. Upon information and belief, this entity is controlled by Williamceau.

2

1

**JURISDICTION AND VENUE**

2      10.     The Court has jurisdiction over the subject matter of this action pursuant to 28

3    U.S.C. § 1331, 1441 and 1446.

4      11.     The Court has personal jurisdiction over Defendants because at times relevant

5    hereto they have done business and made, caused, participated in or induced events

6    occurring within Maricopa County, Arizona out of which these claims arise, and Plaintiff

7    and its agents have resided in Arizona during the relevant time.

8      12.     Venue is proper in the United States District Court for the District of Arizona

9    in Maricopa County pursuant to 28 U.S.C. § 1391.

10

**GENERAL ALLEGATIONS**

11     13.     GRSS is a company which develops technologies to detect oil, gas, minerals,

12   and water beneath the ground using seismic waves.

13     14.     In October 2016, principals of GRSS spoke with Stephenson via phone from

14   Arizona and sent an email from Arizona for the purpose of seeking funding for GRSS's use

15   in the development of its technologies and the use of its technologies to identify and drill oil

16   wells. Stephenson had represented himself as an attorney who would assist GRSS with

17   locating and securing funding.

18     15.     In December 2016, Stephenson introduced Thomas "Tommy" Crawford,

19   President of GRSS, to Brailey. Stephenson introduced Mr. Crawford to Brailey as a banker

20   from New York State who would also assist GRSS with locating and securing funding for

21   its technologies and oil-drilling ventures.

22     16.      Brailey spoke by phone with Mr. Crawford when Mr. Crawford was in

23   Arizona about the concept of "platform trading" as a way GRSS could raise funds to use in

24   its business.

25     17.     Brailey told Mr. Crawford that using platform trading, GRSS could gain

26   access to a large one-year loan while only having to put up a small amount of "seed money"

27   in order to obtain the loan.

28

3

18.     Brailey said that after obtaining the loan, the proceeds should be invested in a platform fund that would provide excellent returns. According to Brailey, these returns would be earned by purchasing discounted banking instruments that are turned daily. At the end of the loan period, the loan would be repaid along with interest, and GRSS could use the excess profit to begin investing in the development of its technologies and its drilling ventures.

19.     According to Brailey, who emphasized his experience in the banking and finance industries, platform trading was a safe and legitimate way to raise funds and make money. Brailey and Stephenson emailed Mr. Crawford in Arizona articles and information about platform trading to underscore its legitimacy. *See* emails related to platform trading from Stephenson and Brailey to Mr. Crawford, Exhibit 1.

20.     One of these emails included a document entitled "Understanding the Rules of the Road" which stated that it is a "'privilege' to be invited to participate in a Private Placement Transaction Program," and that "clients must first prove that they are qualified, not the other way around." *See* Understanding the Rules of the Road, Exhibit 2.

21.     Towards the end of December 2016, Brailey approached Mr. Crawford with an "opportunity" to obtain a loan of $200 million which could be used in platform trading. According to Brailey and Stephenson, this opportunity was presented by a trader named Guery Williamceau. Stephenson and Brailey told Mr. Crawford, a retired Air Force Major General, that Williamceau was formerly in the Air Force and that he was a shrewd investor with access to exclusive private trading platforms.

22.     Brailey told Mr. Crawford that in order to obtain the $200 million loan, GRSS needed to submit at least $230,000 of seed money up front to Williamceau. This fell in line with the literature Stephenson provided to Mr. Crawford which required clients to "prove that they are qualified, not the other way around." *See* Exhibit 2.

23.     Brailey and Stephenson told Mr. Crawford that after obtaining the $200 million loan, Williamceau would place the funds in a platform trading program that would earn them a lucrative one-year return, approximately 20%. After repaying the principal and

4

1  interest of the loan one year later, this would leave GRSS with millions of dollars it could

2  use for its technologies and drilling ventures.

3       24.    Brailey and Stephenson highly recommended that GRSS submit the

4  $230,000.00 to Williamceau to obtain the "loan." While Brailey and Stephenson acted as if

5  they were on the same team as GRSS, when Mr. Crawford talked to them about coming up

6  with the $230,000.00 seed money, both Brailey and Stephenson stated that they had no

7  liquidity and would not be able to contribute anything.

8       25.    Having represented himself as a lawyer, Stephenson stated that he would

9  handle all the legal paperwork for the investment in exchange for $10,000.00. This meant

10  that GRSS would need to find a total of $240,000.00 for the deal.

11      26.    Seeking to entice Mr. Crawford and GRSS to invest in the platform trading

12  scheme, Stephenson offered to establish a UCC lien on his 15% interest in Swartz Heirs

13  Holdings, LLC if Mr. Crawford was able to put up the $240,000.00 seed monies. *See*

14  January 3, 2017 email from Stephenson to Mr. Crawford, Exhibit 3. Stephenson told Mr.

15  Crawford that Swartz Heirs Holdings LLC was a Delaware LLC that contained over $20

16  million in assets.

17      27.    Upon information and belief, Stephenson has never been licensed to practice

18  law in Connecticut, as he represented to Mr. Crawford.

19      28.    Stephenson suggested that GRSS send the $240,000 to him first, and that he

20  would serve as the conduit to pass the funds along to Williamceau for the platform trading

21  program.

22      29.    Pursuant to this understanding, on or about January 4, 2017 GRSS wired

23  $240,000.00 from Arizona to Stephenson to be used in the platform trading program.

24      30.    On January 11, 2017, Stephenson emailed Mr. Crawford a copy of what he

25  referred to as NFG's "CV" as well as a copy of a Master Asset Management Agreement.

26  The CV advertised that NFG has "expertise in numerous professional fields" which allows

27  NFG "to provide Consulting and Advisory Services aimed at optimizing its clients' needs

28  and goals". *See* NFG CV, Exhibit 4. The CV further provides that NFG has over 15 years of

5

experience in "Funds Management, Private Investment Banking, Project Funding, Specialized Investments and Commodities trading."

31.     The Master Asset Management Agreement was entered into between Stephenson and NFG on January 8, 2017. *See* Master Asset Management Agreement, Exhibit 5. The Master Asset Management Agreement sought to document the transfer of the $200 million loan from ES Holdings (represented by Stephenson) to NFG (represented by Williamceau). NFG was to use the $200 million loan to "monetize such assets through placement with [NFG] and its sources" such as its "roster of financial institution and trading groups".

32.     The Master Asset Management Agreement stated that Stephenson/ES Holdings decided to place its assets with Williamceau/NFG "because of [Williamceau/NFG]'s access to financial institutions and trade platforms which are established with a history of operations, including maintaining the required and necessary licenses."

33.     Williamceau/NFG also agreed in the Master Asset Management Agreement "that it will use its best efforts to exploit its contacts and resources to leverage and monetize the assets assigned under management to produce its revenue stream based on representations made to it by its financial institutions and trading platforms."

34.     Stephenson told Mr. Crawford that Williamceau would provide GRSS with its first distribution within thirty days. According to the Master Asset Management Agreement, the monthly distributions would be $25 million.

35.     On January 13, 2017, Stephenson submitted an Outgoing Wire Transfer Request document at Wells Fargo bank documenting a transfer of $230,000 from ES Holdings' bank account to The Covenant Legacy Holdings Trust. *See* Outgoing Wire Transfer Request, Exhibit 6. Under the "Additional Instructions" section of the Wire Transfer document, it states "agreement no NFGESH0200MUS." This same agreement number is on the first page of the Master Asset Management Agreement.

6

36.     It is unknown whether Brailey and Stephenson actually sent all the $230,000.00 to Williamceau or if they simply kept some of it for themselves.

37.     Over the course of the next couple weeks in January 2017, Stephenson sent emails to Mr. Crawford providing him "updates" on the status of the funds and when GRSS could expect its first distribution. These updates were simply ways to keep stringing GRSS along and revising GRSS's expectations of when it would receive its money back. The updates often included commentary by Brailey, as Brailey was the intermediary between Williamceau and Stephenson.

38.     Stephenson's "updates", which continued into early February, only provided excuses for why the fund distribution deadlines were being pushed back.

39.     On February 6, 2017, Stephenson sent another "update" to Mr. Crawford in Arizona. In this email, he stated: "I just got off [the phone] with Bob [Brailey]. He had been on with his California people try to run Guery down. Bottom line: they have not yet reached Guery. Sadly, we are left with a choice of two options: (1) to speculate (2) to let Bob get the most current facts and report back to us. We may hear later this evening. But I am more inclined to expect answers tomorrow." *See* February 6, 2017 email from Stephenson to Mr. Crawford, Exhibit 7.

40.     The next day, on February 7, 2017, Stephenson emailed Mr. Crawford in Arizona: "Bob [Brailey] expressed his view that the deal will get done; but therre [sic] may be some delays. He attributes it to the Trust exercising its rights under the 'Golden 'Rule' – 'He who has the gold makes the rules'. We still have some wiggle room to meet the target for the first distribution. We will find out where we are when Bob and his California people speak with Guery." *See* February 7, 2017 email from Stephenson to Mr. Crawford, Exhibit 8.

41.     On February 8, 2017, Stephenson sent another email to Mr. Crawford providing little actual information and further pushing back the distribution deadlines.

72063042.6

42.    Stephenson sent an email to Williamceau on February 13, 2017 expressing that he and his "associates are quite concerned at the lack of progress." *See* February 13, 2017 email from Stephenson to Williamceau, Exhibit 9.

43.    Two weeks later, on February 27, 2017, Stephenson sent another email to Brailey and Mr. Crawford stating that he had "heard nothing from Guery [Williamceau], as I write this e-Mail. It appears as though he wasn't moved by my demand. Perhaps your California people can shed some light on this?!" *See* February 27, 2017 email from Stephenson to Brailey and Mr. Crawford, Exhibit 10.

44.    Between January and February 2017, Stephenson called Mr. Crawford dozens of times about the project with Williamceau. These calls occurred while Mr. Crawford was in Arizona.

45.    Brailey and Stephenson were unable to connect with Williamceau after February 2017. In May 2017, Mr. Crawford sent an anonymous email to Williamceau's email address asking Williamceau to call him. He did, but once Williamceau realized who Mr. Crawford was, he abruptly hung up the phone. He did not answer when Mr. Crawford called back.

46.    Mr. Crawford has been unable to contact Williamceau since.

47.    Over the course of the next two and a half years, from May 2017 through November 2019, Stephenson and Brailey have continued to provide Mr. Crawford excuses as to why they caused GRSS to lose $240,000.00.

48.    To this day, GRSS, Mr. Crawford and Mr. Carmack have not received any of the money they invested with Stephenson, Brailey and Williamceau.

## FIRST CLAIM FOR RELIEF

## SECURITIES FRAUD (17 C.F.R. § 240.10b-5)

### (Against all Defendants)

49.    Plaintiff incorporates the foregoing allegations as though set forth herein.

50.    Defendants sold Plaintiff securities in the form of an investment contract involving a platform trading program.

72063042.6

51.     Over a period of approximately two and a half years, and unbeknownst to Plaintiff, the Defendants, acting with scienter and the intent to deceive, continuously made untrue statements of material fact and omitted to state material facts, or knew material misrepresentations were being made and material facts were being omitted, while deceiving Plaintiff into believing that the platform trading program was a legitimate investing strategy and that their monies were being used by Williamceau and NFG to obtain returns for GRSS.

52.     In connection with the offer and sale of securities to Plaintiff, the Defendants made materially false, misleading and untrue statements, including but not limited to, the following:

      a.     Stephenson was a lawyer licensed to practice law in Connecticut with connections in the finance industry;

      b.     Brailey was a New York banker who had connections in the finance and banking industries;

      c.     Williamceau and his entity NFG had experience in platform trading and international finance, and had all the licenses and certifications necessary to engage in it;

      d.     That platform trading was a legitimate investing strategy that Defendants had access to; and

      e.     By contributing $230,000.00 of seed money to Williamceau, Williamceau would be able to obtain a $200 million loan that he would invest in platform trading, ensuring Plaintiff a roughly 20% return after one year on the $200 million loan.

53.     The omitted material facts that were necessary in order to make the statements made, in the light under which they were made, not misleading include, but are not limited to, the following:

      a.     That Stephenson was not licensed to practice law in Connecticut;

      b.     That the platform trading program that Defendants sold to Plaintiff did not in fact exist;

9

c.      That Defendants had no licenses or certifications that gave them authority to engage in the conduct they described to Plaintiff;

d.      That no financial information of any kind would be provided, including income statements, account statements, balance statements, financial projections of the program's performance with supporting documentation, or tax documents;

e.      That no reasonable basis existed for the representations of the program's proposed success; and

f.      That the Defendants were lying to and defrauding Plaintiff as they had no intention of returning its investment or any returns made therefrom.

54.     Pursuant to 17 C.F.R. § 240.10b-5, it is unlawful for any person, directly or indirectly, the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to: (a) employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

55.     The Defendants sold securities, while outside the state, to Plaintiff while Plaintiff was within Arizona in the form of an investment contract involving the platform trading program. In connection with the sale of those securities in Arizona, the Defendants employed a scheme to defraud Plaintiff, made numerous untrue statements of material fact and omitted numerous material facts necessary to keep the statements from being misleading, and engaged in transactions operating as a fraud or deceit. In so doing, the Defendants violated 17 C.F.R. § 240.10b-5.

56.     Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $240,000.00. The $240,000.00 total is comprised of the $230,000.00 seed monies

72063042.6

1    in addition to the $10,000.00 Stephenson charged Plaintiff for the "legal services" he

2    provided related to the program.

3                              **SECOND CLAIM FOR RELIEF**

4               **SECURITIES FRAUD (A.R.S. §§ 44-1991(A)(1)-(3), 44-1999)**

5                              **(Against all Defendants)**

6        57.    Plaintiff incorporates the foregoing allegations as though set forth herein.

7        58.    Defendants sold Plaintiff securities in the form of investment contracts

8    involving a platform trading program.

9        59.    Over a period of approximately two and a half years, and unbeknownst to

10   Plaintiff, the Defendants, with scienter and the intent to deceive, continuously made untrue

11   statements of material fact and omitted to state material facts, or knew material

12   misrepresentations were being made and material facts were being omitted, while deceiving

13   Plaintiff into believing that the platform trading program was a legitimate investing strategy

14   and that their monies were being used by Williamceau and NFG to obtain returns for GRSS.

15       60.    In connection with the offer and sale of securities to Plaintiff, the Defendants

16   made materially false, misleading and untrue statements, including but not limited to, the

17   following:

18                a.    Stephenson was a lawyer licensed to practice law in Connecticut with

19                      connections in the finance industry;

20                b.    Brailey was a New York banker who had connections in the finance

21                      and banking industries;

22                c.    Williamceau and his entity NFG had experience in platform trading

23                      and international finance, and had all the licenses and certifications necessary

24                      to engage in it;

25                d.    That platform trading was a legitimate investing strategy that

26                      Defendants had access to; and

27                e.    By contributing $230,000.00 of seed money to Williamceau,

28                      Williamceau would be able to obtain a $200 million loan that he would invest

                                              11

72063042.6

in platform trading, ensuring Plaintiff a roughly 20% return after one year on the $200 million loan.

61.     The omitted material facts that were necessary in order to make the statements made, in the light under which they were made, not misleading include, but are not limited to, the following:

a.     That Stephenson was not licensed to practice law in Connecticut;

b.     That the platform trading program that Defendants sold to Plaintiff did not in fact exist;

c.     That Defendants had no licenses or certifications that gave them authority to engage in the conduct they described to Plaintiff;

d.     That no financial information of any kind would be provided, including income statements, account statements, balance statements, financial projections of the program's performance with supporting documentation, or tax documents;

e.     That no reasonable basis existed for the representations of the program's proposed success; and

f.     That the Defendants were lying to and defrauding Plaintiff as they had no intention of returning its investment or any returns made therefrom.

62.     Pursuant to A.R.S. § 44-1991(A)(1)-(3), it is unlawful for a person, in connection with a transaction involving securities, to directly or indirectly: (1) employ any device, scheme or artifice to defraud; (2) make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

63.     The Defendants sold securities to Plaintiff within Arizona in the form of the investment contracts involving the platform trading program. In connection with the sale of those securities in Arizona, the Defendants employed a scheme to defraud Plaintiff,

made numerous untrue statements of material fact and omitted numerous material facts necessary to keep the statements from being misleading, and engaged in transactions operating as a fraud or deceit. In so doing, the Defendants violated A.R.S. § 44-1991.

64.     Under A.R.S. § 44-1999, "controlling persons" are also liable for the violations of A.R.S. § 44-1991 made by those "directly or indirectly" under their control. The Defendants all worked in concert to defraud Plaintiff. When one or more Defendant(s) controlled the other Defendants, the controlling Defendant(s) are also liable under A.R.S. § 44-1999. As such, Defendants are all jointly and severally liable for the liability of any of one Defendant under A.R.S. § 44-1991.

65.     Plaintiff has been damaged in an amount to be proven at trial, but in no event less than $240,000.00. The $240,000.00 total is comprised of the $230,000.00 seed monies in addition to the $10,000.00 Stephenson charged Plaintiff for the "legal services" he provided related to the program.

## THIRD CLAIM FOR RELIEF

### COMMON LAW FRAUD

### (Against all Defendants)

66.     Plaintiff incorporates the foregoing allegations as though set forth herein.

67.     Prior to and at the time Plaintiff invested through Stephenson, the Defendants made, or knew were being made, the following untrue statements and false and fraudulent representations:

a.     Stephenson was a lawyer licensed to practice law in Connecticut with connections in the finance industry;

b.     Brailey was a New York banker who had connections in the finance and banking industries;

c.     Williamceau and his entity NFG had experience in platform trading and international finance, and had all the licenses and certifications necessary to engage in it;

72063042.6

d.   That platform trading was a legitimate investing strategy that Defendants had access to; and

e.   By contributing $230,000.00 to Williamceau, Williamceau would be able to obtain a $200 million loan that he would invest in platform trading, ensuring Plaintiff an approximate 20% return after one year on the $200 million loan.

68.   The omitted material facts that were necessary in order to make the statements made, in the light under which they were made, not misleading include, but are not limited to, the following:

a.   That Stephenson was not licensed to practice law in Connecticut;

b.   That the platform trading program that Defendants sold to Plaintiff did not in fact exist;

c.   That Defendants had no licenses or certifications that gave them authority to engage in the conduct they described to Plaintiff;

d.   That no financial information of any kind would be provided, including income statements, account statements, balance statements, financial projections of the program's performance with supporting documentation, or tax documents;

e.   That no reasonable basis existed for the representations of the program's proposed success; and

a.   That the Defendants were lying to and defrauding Plaintiff as they had no intention of returning its investment or any returns made therefrom.

69.   The Defendants made, caused, participated in or induced the above representations knowing them to be false.

70.   The Defendants made, caused, participated in or induced the above fraudulent representations with the intent that Plaintiff would rely on them and make or continue to make investments in the fraudulent platform trading program with them.

72063042.6

71.     The above fraudulent representations and omissions of fact were material to and influenced Plaintiff's decision to invest in the platform trading program.

72.     Plaintiff's reliance on the Defendants' false representations was justified and reasonable.

73.     Plaintiff has been damaged as a result of its reasonable reliance upon Defendants' fraudulent representations.

74.     At all relevant times, the Defendants approved of, made, directed, actively participated in, induced and cooperated in the commission of common law fraud.

75.     Accordingly, the Defendants are personally liable to Plaintiff.

76.     The numerous untrue positive statements of material fact and the numerous omissions of material fact necessary to keep statements made from being misleading, both pre-investment and post-investment, continued into 2019 when it was clear to Plaintiff it had been defrauded. These false and misleading statements were meant to lull Plaintiff into inaction, deceive Plaintiff into believing its investment was safe and growing, to induce it to continue to maintain its investment, and to keep Plaintiff from learning it was the victim of a fraud.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

**(Against all Defendants)**

77.     Plaintiffs incorporate the foregoing allegations as though set forth herein.

78.     The Defendants negligently provided Plaintiff with false information regarding the prospects of the platform trading program. Specifically, through words or conduct, the Defendants negligently misrepresented material facts and information including, but not limited to, the following:

   a.     Stephenson was a lawyer licensed to practice law in Connecticut with connections in the finance industry;

   b.     Brailey was a New York banker who had connections in the finance and banking industries;

72063042.6

c.     Williamceau and his entity NFG had experience in platform trading and international finance, and had all the licenses and certifications necessary to engage in it;

d.     That platform trading was a legitimate investing strategy that Defendants had access to; and

e.     By contributing $230,000.00 of seed money to Williamceau, Williamceau would be able to obtain a $200 million loan that he would invest in platform trading, ensuring Plaintiff a roughly 20% return after one year on the $200 million loan.

79.    The omitted material facts that were necessary in order to make the statements made, in the light under which they were made, not misleading include, but are not limited to, the following:

a.     That Stephenson was not licensed to practice law in Connecticut;

b.     That the platform trading program that Defendants sold to Plaintiff did not in fact exist;

c.     That Defendants had no licenses or certifications that gave them permission to engage in the conduct they described to Plaintiff;

d.     That no financial information of any kind would be provided, including income statements, account statements, balance statements, financial projections of the program's performance with supporting documentation, or tax documents;

e.     That no reasonable basis was provided for the representations of the program's proposed success; and

f.     That the Defendants were lying to and defrauding Plaintiff as they had no intention of returning their seed money or any returns made therefrom.

80.    The Defendants were negligent in communicating these misrepresentations or failing to communicate accurate representations about the platform trading program.

72063042.6

81.     The Defendants negligently provided these representations during the course of their business relationships with Plaintiff with the intent that Plaintiff would rely upon this information in deciding whether to invest in the platform trading program.

82.     Plaintiff relied upon this information when it wired $250,000.00 to Stephenson for its investment in the platform trading program. The $240,000.00 included the $10,000.00 Stephenson charged Plaintiff for the "legal services" he provided related to the program.

83.     Plaintiff's reliance was reasonable and justified.

84.     Plaintiff has been severely harmed as a result of this reliance.

85.     At all relevant times, the Defendants approved, made, caused, directed, actively participated in, induced or cooperated in the negligent misrepresentations.

86.     As a result of these negligent misrepresentations, Plaintiff is entitled to receive compensation and damages sufficient to make it whole for the losses it sustained as a result of the Defendants' negligent misrepresentations.

87.     The numerous untrue positive statements of material fact and the numerous omissions of material fact necessary to keep statements made from being misleading, both pre-investment and post-investment, continued into 2019 when it was clear to Plaintiff it had been defrauded. These false and misleading statements were meant to lull Plaintiff into inaction, deceive Plaintiff into believing its investment was safe and growing, to induce it to continue to maintain its investment, and to keep Plaintiff from learning it was the victim of a fraud.

## FIFTH CLAIM FOR RELIEF

### CONVERSION

### (Against all Defendants)

88.     Plaintiff incorporates the foregoing allegations as though set forth herein.

89.     As a result of the Defendants' wrongful taking of Plaintiff's funds and withholding and denying the returns due and owing to Plaintiff, Plaintiff was deprived of those funds and has been harmed thereby.

72063042.6

90.     The knowing and wrongful withholding of money due and owing to Plaintiff constitutes conversion of its funds.

91.     The Defendants' acts were willful, wanton, malicious and oppressive. They were undertaken with the intent to defraud and justify awarding exemplary and punitive damages in an amount to be proven at trial.

92.     As a result of the conversion of funds due and owing to Plaintiff, Plaintiff has been damaged by the loss of the use and value of the funds, as well as attorneys' fees and costs incurred as a consequence of the Defendants' actions.

## SIXTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

#### (Against all Defendants)

93.     Plaintiff incorporates the foregoing allegations as though set forth herein.

94.     The Defendants held a superior position over Plaintiff as they represented themselves as a licensed attorney, experienced financial advisor, and were in exclusive control over the funds invested in the platform trading program.

95.     Plaintiff placed a special reliance in the trustworthiness of Stephenson and his representations that he was a licensed attorney.

96.     The Defendants breached their fiduciary duties to Plaintiff by misrepresenting the prospects of the platform trading program in order to induce Plaintiff to contribute additional funds and by stealing its money.

97.     The Defendants placed their need for cash above their fiduciary duty to Plaintiff.

98.     The Defendants' breach of their fiduciary duty has caused Plaintiff irreparable harm, including substantial monetary damages.

## SEVENTH CLAIM FOR RELIEF

### FRAUDULENT CONCEALMENT

#### (Against all Defendants)

99.     Plaintiff incorporates the foregoing allegations as though set forth herein.

18

72063042.6

100.   Prior to, during, and after the time Plaintiff put its funds into the platform trading program, the Defendants concealed material facts that they knew should have been disclosed.

101.   The Defendants knowingly concealed facts they knew to be material and that should have been disclosed to Plaintiff prior to taking the funds for investment.

102.   The Defendants concealed or failed to disclose the above facts with the intent of creating a false impression of the actual facts in the mind of Plaintiff.

103.   The Defendants concealed the above material facts with the intent that Plaintiff would contribute and continue to invest in the platform trading program, knowing that Plaintiff would not invest had it known the truth.

104.   The Defendants concealed or failed to disclose the above facts with the intent that Plaintiff would provide funds to the Defendants.

105.   The above concealed facts would have been material to Plaintiff's decision to invest in the platform trading program.

106.   Plaintiff, in fact, would not have invested in the platform trading program had the actual facts been known to it.

107.   Plaintiff was ignorant of the actual facts based on the Defendants' efforts to conceal, fail to disclose, or alter them.

108.   Plaintiff relied on the Defendants' altered facts.

109.   Plaintiff's reliance was justified and reasonable.

110.   The Defendants affirmatively made, approved of, caused, directed, actively participated in, or cooperated in the concealment of material facts.

111.   The Defendants' concealments were meant to lull Plaintiff into inaction, deceive them into believing its investment was safe and growing, to induce it to continue to hold its investment in the platform trading program, and to keep Plaintiff from learning it was the victim of a fraud.

112.   Accordingly, the Defendants are personally and individually liable to Plaintiff.

113.   Plaintiff prays for judgment in its favor and against Defendants by awarding damages sufficient to compensate it for the losses sustained as a result of Defendants' fraudulent concealment, together with pre-judgment interest, costs and attorneys' fees, and such other and further relief as the Court deems just.

## EIGHTH CLAIM FOR RELIEF

### PUNITIVE DAMAGES

### (Against Stephenson, Brailey, and Williamceau)

114.   Plaintiff incorporates the foregoing allegations as though set forth herein.

115.   Stephenson, Brailey and Williamceau abused their relationships with Plaintiff and Plaintiff's agents by deceiving them to invest in the platform trading program when they *knew* it was a fraud.

116.   Stephenson, Brailey and Williamceau knew the platform trading program was a fraud because they had manufactured it. They created the fiction of the program for the sole purpose of stealing Plaintiff's money by preying on them.

117.   Stephenson, Brailey and Williamceau preyed on Plaintiff for the sole reason of getting them to invest their money so they could steal the funds.

118.   The facts of this case demonstrate a clear-cut plot to steal Plaintiff's money.

119.   The facts here contain the elements required by the Supreme Court of Arizona when implementing punitive damages, including the presence of Stephenson, Brailey and Williamceau's "evil mind." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330 (1986).

120.   Punitive damages are needed here to punish the reprehensible acts of Stephenson, Brailey and Williamceau and to deter others from doing the same.

121.   Plaintiff requests the Court award punitive damages against Stephenson, Brailey and Williamceau in an amount to be determined at trial, but no less than the $240,000.00 it thought it invested in the platform trading program.

72063042.6

1

## **PRAYER FOR RELIEF**

2      **WHEREFORE**, Plaintiff requests judgment against Defendants as follows:

3      A.      For damages in an amount to be proven at trial, but in no event less than

4 $240,000.00;

5      B.      For an award of costs under Fed. R. Civ. P. 54, A.R.S. § 12-341 and

6 attorneys' fees under A.R.S. § 44-2001(A);

7      C.      For an award of pre-judgment interest on all amounts awarded, at the

8 statutory rate, from the dates the contributions were made until entry of judgment;

9      D.      For an award of post-judgment interest on all amounts awarded, at the highest

10 rate allowable by law, from the date of judgment until paid in full;

11      122.    For an award of punitive damages; and

12      123.    For any other relief that the Court deems appropriate.

13      Dated this 25th day of March, 2020.

14

15                              Polsinelli PC

16
                                By: */s Paul J. Roshka Jr.*
17                                   PAUL J. ROSHKA JR. (#009285)
                                     proshka@polsinelli.com
18                                   T.J. MITCHELL (#034827)
                                     tmitchell@polsinelli.com
19                                   CityScape, One E. Washington St., Ste. 1200
20                                   Phoenix, AZ 85004
                                     (602) 650-2000
21                                   *Attorneys for Plaintiff*

22

23

24

25

26

27

28

EXHIBIT 1

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Monday, December 26, 2016 1:57 PM |
| **To:** | Tommy Crawford; Paul Schuldt |
| **Subject:** | Mechanics of Trading; Federal Reserve Bulletin; ICC Publicatioin 580 |

Gentlemen:

Beneath my signature are topics under three headings which I intend to be useful to you.

I am going to head out shortly. But, I will be available by phone. I plan to be here in the office between 8:30 and 9:00 AM EST.

Regards,

E.S.

*********************************

<u>Trading Mechanics</u>

A cardinal rule, imposed upon the program manager by the regulating bodies, is a requirement that he must have an exit position established as a condition precedent to purchasing paper for resale. Similarly, to perform his part of the exit contract, which obligates him to provide paper to his exit buyer, he must have established a contract with a provider.

The transaction commences with the program manager executing a purchase transaction with his supplier.

The initial step is performed by the program manager's banker who sends a S*W*I*F*T message to the provider's banker, showing proof of funds and indicating his r/w/a status to purchase the provider's paper.

the provider's banker then screens the instrument, usually in denominations of $500 MIllion, to the program manager's banker who then validates and authenticates the instrument which was screened.  He then sends a S*W*I*F*T message stating that he is ready to execute the purchase; and the two bankers set a time for contemporaneous exchange of funds for the instrument.

When the purchase is complete, the program manager's account has little or no cash on deposit; but, the cash has been replaced by an instrument of value equal to, or greater than, the amount of the cash originally on deposit.

With the purchase phase complete, the forward sale (sale to the exit buyer) phase commences with the program manager's banker sending a S*W*I*F*T message to the exit buyer's banker, stating that he has an instrument for sale.

The exit buyer's banker responds, by S*W*I*F*T message that he is r/w/a to purchase the instrument and screens a proof of funds.

The program manager's banker validates and authenticates the proof of funds and screens the instrument, to the exit buyer's banker.

The exit buyer's banker validates and authenticates the instrument and sends a S*W*I*F*T message that he is ready to execute the transaction.

The two bankers agree on a time for contemporaneous exchange of funds for the instrument.

With the transaction complete, the program manager's trading account now has a cash balance on deposit which is greater than the original cash amount, the difference being the difference between the price at which be bought the paper from his provider and the price at which he sold it to his exit buyer.

In our case, the program manager will be one signatory on the trading account with me as the other. I will instruct him to distribute our share of the profits to our operating account, presently contemplated to be the ES Holdings ONE LLC account in Wells Fargo.

As to taxation, Bob Brailey states that until/unless the profits on trading are taken down to the benefit of an individual, no taxable event is created. On the one hand, one could argue that a taxable event is created at the point that profits are generated. On the other hand, one could argue that the funds yielded are revenues to the JV and that revenues are not taxed until all operating expenses are netted from them. We probably should seek the advice of a specialist.

Publications Which Are Pertinent to Platform Trading
US Federal Reserve - Federal Reserve Bulletin - August 1993 - Volume 79 #3 - Medium Term Notes - Page 7623 - Exempt from registration under Section 3(a) of Securities Act of 1933.

International Commerce Commission - ICC Publication 580 - Bank Debenture Trading Programs.

I am told that these publications are no longer available. But, I would hazard a guess that a good library is likely to have them squirreled away in their archives.

Federal Accounting Standards Board
Link to URL for Federal Accounting Standars Board WEB Site - "http://www.fasb.org/home".

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Thursday, December 22, 2016 10:19 AM |
| **To:** | Tommy Crawford |
| **Subject:** | $200 MM Deal |
| **Attachments:** | $200 MM  ES Holdings.doc |

Tommy:

See attached file. . . .


Regards,

E.S.

1

## $200 MILLION FINANCING FACILITY

Basics

An established foundation will enter into a Joint Venture (the "JV") with an operating company; the minimum amount the foundation will place in the JV is 200 Million Dollars. The foundation is drawing the funds, which they place in the JV, from a trust. The trust charges interest on the subject funds at a rate of fifteen percent (15%) per annum. The interest obligation is borne by the JV: 7.5% to the foundation; 7.5% to the operating partner. The foundation will open a JV account in the operating partner's Trading bank; All profits, generated by the JV, as well as all costs generated by the JV, will be shared equally by the JV partners. The motivation, to the foundation, for offering the facility is that they need a third party in order to justify trading.

Initiating the Transaction

The operating company must submit a document package consisting of (1) a brief description of the company, its history, its principals, its business model and the impact of the capital infusion on the company's operations; or a Project Package. (2) a client information sheet (standard form); (3) passport of the party designated by the company to bind the company at law; (4) proof of funds in the amount $ 240,000. The foundation will vet the package and respond with a term sheet (the foundation reserves the right to decline without explanation). If the operating company accepts the terms and conditions, as stated on the term sheet, they sign and return the term sheet, together with a payment in the amount of Origination Fee.. The Origination Fee is deposited in an escrow account and held there until the foundation proves funds to the operating company's banker and the banker affirms same to the operating company. In the mean time, the foundation tenders a contract to the operating company. When the operating company returns the signed contract, The Origination Fee is released to the foundation, whereupon, the foundation moves the agreed amount into the JV account.

Memorializing the Transaction

In addition to the contract, binding the foundation and the operating company, the operating company will execute two promissory notes: (1) a promise to pay the full amount of the initial capital infusion at the end of the term of the contract; (2) a promise to pay the interest, at a rate of seven-and-one-half percent at the end of the term.

The Cost of the Transaction to the Operating Company

The cost to the operating company is the sum of the Origination Fee and the interest at the rate of seven-and-one-half percent per annum. The Origination Fee is an out of pocket cost to the operating company. The interest is paid from profits, inasmuch as it is capitalized at the commencement of the transaction (no payments unil the end of the term after profits are generated).

Options for Use of the Funds

The operating company may elect one of two operations (which are mutually exclusive: (1) leave the funds, undisturbed, in the JV account for use as a proof of funds to demonstrate capability to make a purchase, the contents is to sold forward for a profit; (2) instruct the foundation to trade the funds on a bank trading platform.

In the case of Option '1', all profits on the forward sale, of the contents of a purchase, are divided, fifty/fifty, between the operating company and the foundation.   In the case of Option '2', all profits, generated by trading on the bank trading platform, are divided, fifty/fifty, between the operating company and the foundation.

Use of the Funds in the case of GRSS-PAC

Inasmuch as the major cash flow from the GRSS-PAC transaction will be generated after the end of the term of the contract, the only reasonable choice is Option '2'.   Assuming that the foundation would trade for a forty week period, and assuming that the operating company's share of the profits on trading is $20 Million per month, a total amount yielded on a forty week period is $240 Million.

Under such a scenario, based upon the existing business plan, all that would be necessary to fully fund the project would be to profits from two weeks, plus a partial third week, of trading. We are faced with the rather pleasant dilemma of what to do with the remaider profits ($196 Million)

There are some other management issues to take up, such as: do we organize as described in the existing business plan; do we increase the size if the project; how are the revenues on production to be divided, etc.

EXHIBIT 2

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Tuesday, December 27, 2016 2:49 PM |
| **To:** | Tommy Crawford; Paul Schuldt |
| **Subject:** | Pow-Wow Tomorrow at 2:00 PM EST |
| **Attachments:** | Understanding the Rules.docx |

Gentlemen:

Bob Has asked that you re-visit 'Understanding The Rules, prior to our Pow-Wow. Accordingly, I have attached a copy of it.

Also, Bob and I researched the Wikipedia with search parameters  "ICC 600". You will find a lot of good info there.

Regards

E.S.

## UNDERSTANDING THE RULES OF THE ROAD

None of the customary standards and practices that apply to normal, conventional business, investing and finance applies to private funding programs. It is a "privilege" to be invited to participate in a Private Placement Transaction Program, not a "right." The trading administrators and managers have a virtually endless supply of financially qualified applicants. All things considered, the trading administrators and their banks will favor the applicant who provides the best paperwork. An applicant should never underestimate what the trading entities knowledge about him. Failure to provide full disclosure will disqualify the disingenuous. Clients must first prove that they are qualified, not the other way around. Until the client is accepted by Compliance, the Traders, and Trading Banks, no placement can occur. The U.S. Patriot Act has introduced obligatory compliance procedures. Face□to□face interviews with compliance officers and program management are occasionally required, but generally not necessary. Any arrogant or demanding personality will guarantee rejection of the applicant. Only the principal owner of funds is required as signatory. Corporations must empower an Officer or Director as sole, exclusive signatory by using a Corporate Resolution. Not only do the funds have to be on deposit in an acceptable bank; they must also be in an acceptable jurisdiction. It is felony fraud to submit documents or financial instruments that are forged, altered or counterfeit. Such documents are promptly referred to the appropriate law enforcement agencies for immediate criminal prosecution. The practices, procedures and rules are determined, and governed by, by the U.S. Federal Regulatory Authorities, Western European Central Banks program management, licensed traders and trading banks. It is their decision whom to accept and whom to reject. Contract terms, yield, schedules, etc., are made to fit their needs and schedules – and not the caprices or demands of the investors. This marketplace is highly regulated and strictly confidential, and absolute confidentiality by the investor is a key element of every contract. A client who breaks confidentiality will precipitate instant cancellation. Finally, submission of the application documents to more than one management group at a time is termed "shopping". If an investor "shops" he can expect that this fact shall be quickly disseminated and known among the program management groups who maintain close communication – and will then be accepted by none and rejected by all.

EXHIBIT 3

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Tuesday, January 03, 2017 9:36 AM |
| **To:** | Tommy Crawford |
| **Subject:** | Line on My Membership Interest in Swartz Heirs Holdings LLC |

Tommy:

Referring to the message you received from John HAwley, excerpted beneath my signature, I am ready,  willing and able to file a IUCC ien on my membership interest in Swartz Heirs Holdings LLC.

As we both know, time is of the essences, as to establishing the fund with which to prove up to commence the contemplated transaction. I can have my office mate, Lawrence D. (Larry) Church, Esq. provide his attorney's undertaking that the filing will be expedited. Thus, you will know that the line will be in place contemporaneously with, or very shortly after, the completion of the loan.

FYI - Swartz Heirs Holdings LLC is a Delaware LLC; and owns the fee interest in 5,500 acres in Clay County WV, ahe mineral rights in 10,000 acres which are contiguous to the 5,500 acres; Mineral rights in a large portion of Kanawha County WV, mineral rights in more than half of Texas County OK, Mineral rights in 600 acres in Grant County KS and mineral rights an small parcels of land, in Chambers County TX, totalling nominally 120 acres.  We have the Clay County holdings on the market for $10,000,000; and the entire package on the market dfor $20,000,000. My membership interest in Swartz Heirs Holdings LLC is nominally Fifteen Percent.

Regards,

E.S.

**************************************

Tommy,

Please ask Ed how fast he can act to have a UCC lien processed to collateralize the $210k loan.  I plan to meet with Wayne and Peggy this afternoon on the subject.  Would be nice to have Ed's answer.  Also, a short letter or e-mail from him promising to take this action would be helpful.

EXHIBIT 4

# *NFG ASSET WEALTH MANAGEMENT*
## CONSULTING AND ADVISORY SERVICES
### 1501 Broadway 12th floor
### New York, NY 10036

### Satellite Office
### 3389 Sheridan Street, Suite 427
### Hollywood, FL 33021
### 1-888-640-6001 . 954-634-2806

## About Us
NFG Asset Wealth Management' expertise in numerous professional fields, allows us to provide Consulting and Advisory Services
aimed at optimizing its clients' needs and goals by providing solutions to individuals, corporate, institutions and governments.
Located in Switzerland, Miami, New York, Singapore, and Hongkong we have developed a network of clients and projects located in Europe, South Asia, South East Asia,Caribbean, North America and South America.
Our expertise extends across a broad range of sectors, including banking, financial, investments, real estate, engineering, security and technology.
We have over **15** years of experience in Funds Management, Private Investment Banking, Project Funding, Specialized Investments and Commodities trading.

We provide the below listed services based upon private introduction only. Our work is "private" and we prefer to remain as such. These services are in addition to our own internal projects owned and managed by NFG Asset Wealth Management, a privately held group of companies.
## Our Professional Consulting Services
As seasoned professionals we have a great deal of expertise and knowledge. We can provide each client with practical advice in the following areas and service sectors.
## Financial
• Private Investment banking
• Finance
• Project Funding
• Specialized Investments
• Private Equity and Venture Capital Funding
• Investment Management
• Asset Management
• Securities Brokering
• Financial Leasing
## CONSULTING AND ADVISORY SERVICES (CONT'D)
- 2 -
• Funds Management
• Bank Account Openings
## Fiduciary
• Company Structuring and Advice
• Formation of Trusts, Companies and Foundations
• Management of Trusts, Companies and Foundations
• Board and Shareholder Representation
• Paymaster Services
• Escrow and Related Services
## Advisory

- Financial and Banking Sector
- Restructuring
- Business Development

## Consultancy

- Strategy and General Management
- Operations
- Marketing Strategy

## Administration

- Tax Planning
- Tax Optimization
- Tax Filing
- Legal Services
- Accounting
- Bookkeeping
- Auditing
- Work Permits
- Payroll Management
- Personnel Management

## Corporate

- Mergers and Acquisitions

- Company Appraisals and Evaluations

- Insurance
- Risk Management
- Contract Management
- Project Management
- Project Support

## CONSULTING AND ADVISORY SERVICES (CONT'D)

- 3 -

## Project Management

- Planning
- Design and Project Management in electrical, mechanical, automation and control systems for industrial, plant, office, facility, architectural and environmental projects
- Consulting and Project Management from development and implementation and facilities engineering and architectural projects, equipment and systems design, manufacturing, fabrication and installation, project construction and client coordination, space planning, materials handling, automation, bulk handling, solid and liquid waste handling, food freezing and packaging, bottling, packaging, storage systems, AS/RS systems and assembly
- Reports and Surveys, Investigations and Hearings, Environmental Impact Studies, Engineering/Executive Assignments

## Real Estate

- Design
- Development
- Appraisals and Valuations
- Marketing
- Funding
- Acquisition
- Property Management
- Portfolio Management

## Fees and Charges

We charge for providing professional advice to Clients. Advice is also a service. We do not provide professional services on a "Pro Bono" basis.

Our base of knowledge is extensive and is our own Intellectual Property. We have too many years of experience

in this business to give our services, expertise and advice away for free.

## CONSULTING AND ADVISORY SERVICES (CONT'D)

- 4 -

There will be an initial consultation directly with each prospective Client where we will evaluate if the Client is right for us and if we can provide the necessary services requested by the Client. The Client also has the opportunity to evaluate NFG Asset Wealth Management to determine if we are right for them. This initial consultation will be free.

After the initial consultation, and if both Parties agree to proceed with providing certain services, NFG Asset Wealth Management
will provide the Client with the following documentation:

• NFG Asset Wealth Management Initial Evaluation / Proposal

• NFG Asset Wealth Management Mutual Non-Disclosure Agreement (for Client signature)

• NFG Asset Wealth Management Terms and Conditions of Business

• General Schedule of Fees

• NFG Asset Wealth Management Letter of Engagement (for Client signature, which is the Client acceptance of the Proposal,
Term and Conditions of Business and Schedule of Fees)

After the Client signs and returns the Letter of Engagement, NFG Asset Wealth Management will invoice the Client for the initial
service / consulting work to be performed.

NFG Asset Wealth Management will charge reasonable fees to each Client based upon the type of consultancy advice and/or
services to be provided. Where outside (subcontracted) work and services are to be performed, we will use our own professional advisors, banks, financial institutions, fiduciary companies, accounting, law firms, etc.

NFG Asset Wealth Management reserves the right to charge the Client a fee for preliminary evaluation and due-diligence of
documentation submitted.

NFG Asset Wealth Management will never charge a Client for something that we are not capable of providing. After receipt of the payment from the Client, the service for the Client will then commence.

NFG Asset Wealth Management has found that a serious Client, desirous of having a certain service provided by a professional firm
such as ours, will gladly pay for the services to be rendered. When a Client pays for the work to be performed then this is also their commitment that they believe in their own project / need. This also eliminates people wanting free advice or services who are time wasters.

This also includes prospective investors as we are making arrangements for certain banking services for them. In some instances, the amount of the initial retainer/fee may be reimbursed to the Client from the initial profit stage of their investment. This will be evaluated on a case-by-case basis.


## In Conclusion

If the service that you require is within our scope of work; and you are willing to pay NFG Asset Wealth Management the required
fee for providing your needed service; then NFG Asset Wealth Management will give you the best professional advice and service to
fulfil your needs.

We look forward to adding you to our list of successful Clientele. And we look forward to having our initial consultation with you.

NFG Asset Wealth Management

# EXHIBIT 5

**Daniel Pino**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Friday, January 13, 2017 7:25 AM |
| **To:** | GUERY@nfglobalinc.com |
| **Cc:** | Bob Brailey |
| **Subject:** | Master Asset Management Agreement - Signed (S) |
| **Attachments:** | EDWARD STEPHENSON JR Cash    Loan-1(ES).pdf |

Guery:

I have attached the Master Asset Management Agreement, bearing my signature. I added a suffix to the File Name - (ES) - to distinguish this file from the one you sent me.

I look forward to a mutually profitable relationship.


Regards,


Ed Stephenson
Telephone  -  203 858 5987

**MASTER ASSET MANAGEMENT AGREEMENT**
      **Multiple Assets under Management**
      **Master Transaction Code:**
      **Agreement No. NFG-ESHO-200MUS**

Date:  January 8, 2017

<u>**PARTIES:**</u>

Party 1      **ES HOLDINGS ONE LLC. / EDWARD STEPHENSON, JR.**
        **50 WASHINGTON ST. 4TH FLR.**
        **NORWALK CT 06854-2710**

        **REGISTRATION NO.  DELAWARE FILE NO. 4435918-01/US**
        **EIN: 11-3768990**

Individual Name and Title:
Contact Information:
Party 2 (Company Name): **NFG INTERNATIONAL HOLDINGS GROUP INCORPORATION LIMITED**
        **UNIT 25A, 25/F., WING HING COMMERCIAL BUILDING, 139 WING**
        **LOK STREET, SHEUNG WAN, HONG KONG**
        **HONG KONG: 852-819-30766 USA   TEL: 1-888-640-6001**
        **EMAIL: GUERY@NFGLOBALINC.COM**

Individual Name and Title:  Guery Williamceau  President

The Parties agree to be legally bound by the terms and conditions contained herein and under the Transaction Description and other related transaction documents. This document may be issued in counterpart and fully executed copies shall comprise a legally binding agreement. Time is of the essence and the parties agree to take all necessary actions to have the transaction in place and funded as quickly as possible for project funding and each respective Company's operations.

**TRANSACTION DESCRIPTION**

**Asset Type: $200 Million Cash Loana**

Party 1 will receive **$25,000,000** per month for 10 months against the $200 Million principal of the loan which should be 100% Cash. The Loan will need to be delivered Via Swift wire to the Benefit of **NFG INTERNATIONAL HOLDINGS GROUP INCORPORATION LIMITED**
   Hong Kong branch designated Bank.
   **Fee: $ 5,000,000 Loan fee per month will be deducted from the Loan amount. Loan will remain**
   **or be blocked for a period of one year.**

The $230,000 origination fee will be sent to the account of Party 2 at Wells Fargo listed on page 6.  Evidence of the $200,000,000 loan will be presented to the client in 3 (three) banking days from the date Party 2 shall have received the origination fee ($230,000).

The first distribution is anticipated to take place within 30 international banking days. A schedule of distribution will be provided once trading commences.

Party 1 **ES HOLDINGS ONE LLC REPRESENTED BY EDWARD STEPHENSON, JR** gives Party 2 **NFG INTERNATIONAL HOLDINGS GROUP INCORPORATION LIMITED REPRESENTED BY GUERY WILLIAMCEAU** Full Control of the $200M Loan available for its use and has been properly registered for which it owns or in which it has an equitable or beneficial ownership interest and such assets are free and clear of any liens and encumbrances or administrative /government holds. Party 1 desires to leverage and monetize such assets through placement with Party 2 and its sources. Party 2 has a roster of financial institutions and trading groups willing to accept qualified assets submitted through it. Qualified assets shall include but are not be limited to certificates of deposit issued by qualified nations or territories, cash backed bank guarantees, cash backed letters of credit issued by qualified financial institutions, and blocked funds held in qualified financial institutions and qualified letters of guarantee issued by qualified financial institutions. Party 1 may submit other assets to Party 2 for acceptance under management however; such acceptance is based on pre-approval from a financial institution or platform.

In addition to this Master Asset Management Agreement, an Asset Management Agreement shall be issued for each asset submitted. Such asset shall specifically refer to the Master Transaction Code first appearing above. Additionally, the assignment must contain The following applicable information: a full legal description of the asset, its location, amount, issue date, maturity date, type of interest being assigned, duration of assignment, name of owner and its designated authorized signatory (if a Corporation, Trust, LLC or association a resolution approving the assignment must be attached to the assignment), distribution of proceeds and any other pertinent information that has a material impact on the asset and the assignment.

Each assignment shall contain the statement "for valuable consideration received and acknowledged" prior to stating an assignment is being made. Each asset and assignment document with supporting information shall be attached to the Master Asset Management Agreement and incorporated herein.  The specific terms and conditions pertaining to each asset and assignment shall apply specifically to such asset and not affect the terms and conditions of other submitted assets. The assignment shall be a complete and irrevocable assignment and shall contain powers allowing Party 2 to use the asset as intended under this  to fully exploit each access to produce a revenue stream.

Party 1 hereby states, acknowledges and warrants that it knows that Party 2 is not a registered investment advisor or fund manager and that Party 2 has not made any representation to the contrary.
Party 1 further acknowledges that it has decided to joint venture with Party 2 for purposes of placing its respective assets with Party 2 because of Party 2's access to financial institutions and trade platforms which are established with a history of operations, including maintaining the required

and necessary licenses.

Party 2 hereby warrants that it has experience as a program manager and in managing and supervising trading accounts and will use its best efforts to exploit its contacts and resources to leverage and monetize the assets assigned under management to produce its revenue stream based on representations made to it by its financial institutions and trading platforms.

## **PROCEDURES**

1. Party 2 shall have primary responsibility for negotiating and administering the credit facility and/or trade transaction and will coordinate the transaction with the required representatives to close the transaction and have funds deposited.

2. Party 1 shall submit and Party 2 shall accept and review the asset submitted and request any additional information required and deliver the completed package to the financial institution or trading group accepting the asset.

3. Party 2 enters into contract with its sources and monitors said contract.

4. The credit facility and/or investments contract must include a clause agreeing to return any asset accepted hereunder free and clear of liens and encumbrances at the end of contract term to Party 2 who shall immediately return the certificate to Party 1 per the assignment agreement. The trading Agreement shall not exceed one (1) year, unless an extension is mutually agreed to in writing by such Parties.

5. This Master Asset Management Agreement shall remain in full force and effect for a period of One (1) year. However, the Parties can mutually agree to automatically extend this Agreement based on the trading contract by stating their intent in writing to each other at least 60 days prior to the maturity of the underlying transaction agreements via electronic delivery. This Agreement shall remain in full force and effect for a period of 30 business days after the termination of the assignment and/or investment contract, whichever has the latest termination date, or as mutually agreed to in writing between the Parties.

6. All revenues generated from use of the asset or assets placed by the Parties shall after payments of commissions, transaction costs and fees, (net revenues) be divided per the assignment agreement. Net revenues equal gross revenues minus reasonable transaction costs, reasonable commissions due to intermediaries, if any, and amounts due to the lender and/or trading company under the investment agreement. These costs, expenses and fees must be paid prior to the disbursement of net revenues between the Parties as outlined in this paragraph.

7. The terms and conditions of the loan and/or investment contract shall govern receipt of investment payments, including any applicable terms affecting rights of the Parties hereunder which shall be determinative and incorporated herein.

8. The Parties shall use an established account established by Party 2 to receive the revenues generated from an asset prior to distribution and Party 2 may establish sub accounts in the name of Party 1 to receive the funds after all transaction costs, expenses and fees have been paid including maintaining a nominal amount in the operating account.

9.   In the event of a event impairing the Program Manager for either a short or extensive period, Party 2 states there are sufficient personnel in NFG Asset Wealth Management to take on the responsibilities of monitoring and managing the trading events until his return to full capacity.

## OTHER TERMS

Each Party hereto shall be solely responsible for the filing and payment of any applicable taxes and other regulatory fees.

The Parties agree that they have entered this Agreement to pool and utilize their respective resources to generate funds to finance business operations.  The Parties agree and acknowledge that no Partnership is intended or formed by this Agreement and that this Agreement is a non exclusive document allowing each Party to engage in similar transaction with other parties.

It is the understanding of Party 1 that the trading group by accepting and using its asset is not engaging in "high yield trading " but is utilizing leveraging of the asset's value to create an income stream for operations and other projects to be undertaken by the Parties hereto.

Fully executed electronically transmitted copies of this document shall be deemed originals and shall be legally binding and enforceable.

Amendments to this Agreement must be in writing and signed by the Parties.

Pertaining to the subject matter herein this Agreement supersedes all prior oral and written agreements entered into by and between the Parties.

Due to the nature of the transaction structure and interests at risk herein a breach of this Agreement involving an asset and/or payments shall be enforceable at law or in equity in a court of competent jurisdiction. The laws of the State of California shall govern this Agreement.

In the event of a material dispute arising under this Agreement that does not involve an asset or receipt of payments to be made hereunder, the Parties agree to binding arbitration under the applicable rules of the International Chamber of Commerce in Los Angeles, California. The local jurisdictional rules of evidence and procedures shall be adhered to and any such judgement resulting from arbitration shall be filed with and enforced in the applicable court of jurisdiction. The awarding of reasonable costs and attorneys fees to the prevailing party shall adhere to the guidelines then in effect for the jurisdiction in which the hearing takes place to be enforceable.

The Parties may agree to extend this Agreement or under this Agreement perform additional Transactions using a similar transaction structure and such deals shall be included herein as amendments to this document.

The Parties agree that under this Agreement there is no duty by Party 2 to divulge or reveal its sources and contacts to Party 1 and concurrently, Party 1 has no duty to divulge or reveal its contacts to Party 2 unless required for placement of the asset as required hereunder or by law enforcement, proper administrative order or by order of a court of competent jurisdiction.

The Parties further acknowledge that in addition to the jurisdiction that governs this contract and any assignment, the jurisdiction in which the asset is located shall also govern and any conflict of law and shall be settled by a U.S. federal district court in case of a dispute needing resolution.

The Parties understand, represent and acknowledge that PPO has assets that in this private transaction it is not a registered or licensed securities firm and it has explicitly stated that it is presenting opportunities made available to it from parties that have the requisite licenses who will handle the transactions and make sure they conform to all applicable laws and regulations. Furthermore each Party represents and warrants that they have business experience in the subject matter of this private transaction and understand the nature of the transaction, including reviewing this contract with its professional consultants or advisors.

The terms and conditions of this Agreement together with all information that is required to be revealed to the financing sources shall remain confidential as such information relates to non participatory third parties. All information pertaining to the transactions and participants not readily available to the general public shall remain confidential as each assignment hereunder is a private transaction between two parties that know each other. The contracts between the Parties are private transactions between two parties that know each other. The contracts between the Parties are private transactions that are not covered by the U.S. Securities Acts or State Securities Laws.

By affixing his/her signature below, each signatory states under penalty of perjury that he/she has read this document, understands its terms and conditions, sought legal and financial advice if needed, agrees to be bound by the terms and conditions herein, and its duly authorized to execute this agreement and bind his/her respective company or organization.

This Agreement becomes Null and Void if not signed and returned by Wednesday, January 10, 2017 along with the Wire transfer for $230,000.

This Agreement is executed as of the date first appearing above.

*PARTY1 COMPANY NAME*
**ES HOLDINGS ONE LLC**

**NAME: EDWARD STEPHENSON JR.**
**PASSPORT: 521739887**
**EXP:  JULY 6, 2024**
**ISSUE: UNITED STATES OF AMERICA**
**TITLE: MANAGER / AUTHORIZED SIGNATORY**

*PARTY2 COMPANY NAME*
**NFG INTERNATIONAL HOLDINGS GROUP INCORPORATION LIMITED**

NAME: **GUERY WILLIAMCEAU**
**TITLE: PRESIDENT / CHIEF EXECUTIVE OFFICER**
**PASSPORT: FL3759635**
**NFG INTERNATIONAL HOLDINGS GROUP INCORPORATION LIMITED**
**TELEPHONE: +1-888-640-6001**
**E-MAIL: GUERY@NFGGLOBALINC.COM**

The $230,000 will be wire transferred to the coordinates provided below.

**WIRE INSTRUCTION**

| BANK NAME | WELLS FARGO BANK, NA |
|---|---|
| BANK ADDRESS | 420 MONTGOMARY SAN FRANCISCO,CA94104 |
| ACCOUNT NO. | 7040331790 |
| ACCOUNT NAME | COVENANT LEGACY HOLDINGS & TRUST |
| SWIFT CODE | WFBIUS6S |
| BANK OFFICER | IRENE SANDOVAL |
| BANK TEL / FAX | (310) 550-7181 |
| | |
| REFERENCE: | NFGIHGIL |
| SPECIAL WIRE INSTRUCTIONS | ADVISE OF PRE-WIRE |
| REQUIRED MESSAGE | ALL TRANSFER INSTRUCTIONS SHALL STATE: "FUNDS ARE GOOD, CLEAN AND CLEAR, OF NON-CRIMINAL ORIGIN, FREE FROM ANY LIENS AND ENCUMBRANCES, FREELY TRANSFERABLE AND ARE PAYABLE IN CASH IMMEDIATELY, SAME DAY FOR IMMEDIATE CREDIT UPON RECEIPT BY BENEFICIARY'S BANK." |

**NAME: EDWARD STEPHENSON JR.**

**PASSPORT: 521739887**
**TITLE: MANAGER / AUTHORIZED SIGNATORY**

ES HOLDINGS ONE LLC  DISTRIBUTIONS

(20M PER MONTH FOR 10 MONTHS)  TO BE MADE TO THE FOLLOWING COORDINATES :

| | |
|---|---|
| BANK NAME | WELLS FARGO BANK, NA |
| BANK ADDRESS | 637 WEST AVENUE, NORWALK CT 06850 |
| ACCOUNT NO. | ABA # 021101108; ACCOUNT #/2000013238634 |
| ACCOUNT NAME | ES HOLDINGS ONE LLC |
| SWIFT CODE | WFBIUS6S |
| BANK OFFICER | JOSEPH ANDRIANO |
| BANK TEL / FAX | 203 750 1358 |
| | |
| REFERENCE: | NFGIHGIL |
| SPECIAL WIRE INSTRUCTIONS | ADVISE OF PRE-WIRE |
| REQUIRED MESSAGE | ALL TRANSFER INSTRUCTIONS SHALL STATE: "FUNDS ARE GOOD, CLEAN AND CLEAR, OF NON-CRIMINAL ORIGIN, FREE FROM ANY LIENS AND ENCUMBRANCES, FREELY TRANSFERABLE AND ARE PAYABLE IN CASH IMMEDIATELY, SAME DAY FOR IMMEDIATE CREDIT UPON RECEIPT BY BENEFICIARY'S BANK." |

PASSPORT COPY



# EXHIBIT 6

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Friday, January 13, 2017 11:01 AM |
| **To:** | Tommy Crawford; Paul Schuldt; Bob Brailey |
| **Subject:** | Wire Transfer Request - Copy - Attached |
| **Attachments:** | Wire X-Fer Request $230K 011317.pdf |

Gentlemen:

I have attached a copy of the Wire Transfer request. The reason for the handwritten corrections of my address information is that, though I had changed my address for my personal account, I had not changed it for my business account. This will not affect our accomplishment of our goal!

The process took a lot longer than I had anticipated. They wanted to be certain that I knew the parties involved. Every question I answered satisfactorily, begat yet another question. But, in the final analysis, we got it done.

Regards,


E.S.

# Wire Transfer Services

Outgoing Wire Transfer Request

**WELLS FARGO**

| | | | |
|---|---|---|---|
| Today's Date: | | Wells Fargo Reference Number: | |
| 01/13/2017 | | FW00659610130830000 | |
| Banker Name: | | Officer/Portfolio Number: | |
| FIGUEROA, JANICE MARIE | | A7028 | |
| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
| 203/838-4341 | 07690 | 0065961 | J4255-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") and the International Bank Account Number ("IBAN").

## Originator's Information

| | | | |
|---|---|---|---|
| Originator Name: | | Street Address: 50 Washington St.  4ᵀᴴ FL | |
| EDWARD STEPHENSON JR | | ~~12 S MAIN ST STE 202~~ | |
| Primary ID Type: | Primary ID Description: | Address Line 2: | |
| PINV | PIN Validation | | |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
| | | | |
| Secondary ID Type: | Secondary ID Description: | City: | State: |
| DLIC | 012336859 | NORWALK | CT |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: 2710 | Country: |
| CT | 01/22/2015 | 01/22/2021 | 06854-~~2986~~ JMF | US |
| Business, Trust, or Estate Name: | | Home Phone: | Business Phone: |
| ES HOLDINGS ONE LLC | | | 203/858-5987 |

## Wire Amount and Source of Funds

| | | | |
|---|---|---|---|
| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
| 0065961 | $230,000.00 | 2000013238634 | 221 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| | |
|---|---|
| Beneficiary/Recipient Name: | Name/Address Line 1: |
| THE COVENANT LEGACY HOLDINGS     TRUST | DAVID LEE CASON TTE |
| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
| 7040331790 | 857 GLENWAY DR APT 11 |
| Purpose of Funds: | Name/Address Line 3: |
| | INGLEWOOD CA 903027414 |
| | Beneficiary Phone Number: |
| Additional Instructions: | |
| agreement no NFGESHO200MUS | |

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.



Customer Copy

Page 1 of 4

WTR6603 (8-16 SVP)

# Wire Transfer Services
Outgoing Wire Transfer Request

**WELLS FARGO**

Today's Date:
01/13/2017

Wells Fargo Reference Number:
FW0065961013083000

Banker Name:
FIGUEROA,JANICE MARIE

Officer/Portfolio Number:
A7028

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 203/838-4341 | 07690 | 0065961 | J4255-010 |

Outgoing wires can only be sent for Wells Fargo customers. Provide the Customer Copy to the customer ensuring you give them the Wire Transfer Agreement on pages 3 and 4. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See the Wire Transfer Information for explanations of the Mexican CLABE number, the SWIFT BIC, the International Routing Code ("IRC") and the International Bank Account Number ("IBAN").

## Originator's Information

| Originator Name: | Street Address: 50 Washington St. 4th FL |
|---|---|
| EDWARD STEPHENSON JR | 12 S MAIN ST STE 202 |

| Primary ID Type: | Primary ID Description: | | Address Line 2: |
|---|---|---|---|
| PINV | PIN Validation | | |

| Primary ID St/Cuy/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | Address Line 3: |
|---|---|---|---|
| | | | |

| Secondary ID Type: | Secondary ID Description: | City: | State: |
|---|---|---|---|
| DLIC | 012336859 | NORWALK | CT |

| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | ZIP/Postal Code: | Country: |
|---|---|---|---|---|
| CT | 01/22/2015 | 01/22/2021 | 06854-2980 2710 | US |

| Business, Trust, or Estate Name: | Home Phone: | Business Phone: |
|---|---|---|
| ES HOLDINGS ONE LLC | | 203/858-5987 |

## Wire Amount and Source of Funds

| Create AU: | Amount (US Dollars): | Debit Wells Fargo Account: | Bank/COID: |
|---|---|---|---|
| 0065961 | $230,000.00 | 2000013238634 | 221 |

## Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds)

| Beneficiary/Recipient Name: | Name/Address Line 1: |
|---|---|
| THE COVENANT LEGACY HOLDINGS      TRUST | DAVID LEE CASON TTE |

| Beneficiary Account Number/IBAN (Foreign)/CLABE (Mexico): | Name/Address Line 2: |
|---|---|
| 7040331790 | 857 GLENWAY DR APT 11 |

| Purpose of Funds: | Name/Address Line 3: |
|---|---|
| | INGLEWOOD CA 903027414 |
| | Beneficiary Phone Number: |

| Additional Instructions: |
|---|
| agreement no NFGESHO200MUS |

## Wire Fees

Wells Fargo wire transfer fees will be charged to the Originator's Debit Account. Wells Fargo Wire Transfer Fees are disclosed in your most recent Fee and Information Schedule and related amendments and, if applicable, on the Wells Fargo Combined Disclosure for Outgoing Consumer International Wires. Additional fees from intermediary and beneficiary banks may be charged to international transactions. My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions of this request. Wells Fargo is authorized to rely on the information on this Request in making the requested funds transfer.



Customer Copy

Page 1 of 4

WTR6603 (8-16 SVP)

# EXHIBIT 7

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Monday, February 06, 2017 4:21 PM |
| **To:** | Tommy Crawford |
| **Cc:** | Paul Schuldt |
| **Subject:** | Update |

Tommy:

I'm on with Paul as I write ts e-Mail. I just got off with Bob. He had been on with his California people trying to run Guery down. Bottom line: they have not yet reached Guery. Sadly, we are left with a choice of two options: (1) to speculate (2) to let Bob get the most current facts and report back to us.  We may hear later this evening. But, I am more inclined to  expect answers tomorrow.

Regards,

E.S.

# EXHIBIT 8

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Tuesday, February 07, 2017 9:12 AM |
| **To:** | Tommy Crawford |
| **Cc:** | Paul Schuldt |
| **Subject:** | Re: Phone Call with Bob |

Tommy:

Bob expressed his view that the deal will get done; but, therre may be some delays. He attributes it to the Trust exercising its right under the 'Golden 'Rule' - "He who has the gold makes the rules". We still have some wiggle room to meet the target for the first distributon. We will find out where we are when Bob and his California people speak with Guery.

Regards,

E.S.

On Tue, Feb 7, 2017 at 11:07 AM, Tommy Crawford <tommy.f.crawford@cox.net> wrote:

Thanks Ed.  Talk to you in an hour and a half.  Is Bob comfortable or is he starting to squirm a little – just a vector check with the question.  Tommy

**From:** Ed Stephenson [mailto:stephenson.ed@gmail.com]
**Sent:** Tuesday, February 07, 2017 9:02 AM
**To:** Tommy Crawford <tommy.f.crawford@cox.net>; Paul Schuldt <Pwsch1943@email.com>
**Subject:** Phone Call with Bob

Gentlemen:

I just got off the phone with Bob. As of the time of this call, they had heard nothing from Guery. He, and the California people, have texted Guery, alerting him to their planned call with him at 7:00 AM Hawaii time (12:00 NOON EST).

Assuming that they can get through to him at that time, we will have some news by 12:30 PM EST.

Regards,

E.S.

EXHIBIT 9

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Monday, February 13, 2017 2:41 PM |
| **To:** | GUERY@nfglobalinc.com |
| **Subject:** | Status of Transaction |

Guery:

As the counter party to the contract in which you have undertaken to procure a $200 Million non-recourse loan, I am sure you are aware that you have breached the contract, inasmuch as one calendar month has passed since we mutually executed said contract.

I and my associates are quite concerned at the lack of progress.

I thank you for your effort to communicate with both General Crawford and me on Friday. However, your conversation with General Crawford was truncated, as was the message you left on my voice mail.

Would you kindly communicate the status of the transaction by any reasonable method - ASAP - E-Mail - Telephone - Text.


Regards,

Ed Stephenson
Telephone  -  203 858 5987

1

# EXHIBIT 10

**Paul Roshka**

| | |
|---|---|
| **From:** | Ed Stephenson <stephenson.ed@gmail.com> |
| **Sent:** | Monday, February 27, 2017 7:40 AM |
| **To:** | Bob Brailey; Tommy Crawford; Paul Schuldt |
| **Subject:** | Nothing from Guery |

Bob:

I have heard nothing from Guery, as I write this e-Mail. It appears as though he wasn't moved by my demand.  Perhaps your California people can shed some light on this?!

Regards,

E.S.